UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

STEPHEN ROBERT GETTER,

            Petitioner,

v.

            Case No. 1:22-cv-329

            Hon. Hala Y. Jarbou

JAMES CORRIGAN,

            Respondent.
_____/

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Stephen Robert Getter is incarcerated with the Michigan Department of Corrections at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. On August 11, 2017, following a four-day jury trial in the Calhoun County Circuit Court, Petitioner was convicted of first-degree premeditated murder, in violation of Mich. Comp. Laws § 750.316(1)(a), and possession of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b(1). On October 2, 2017, the court sentenced Petitioner to life imprisonment without parole for first-degree murder, to be served consecutively to a 2-year sentence for the felony-firearm violation.

On April 5, 2022, Petitioner, through counsel filed his habeas corpus petition raising the following ground for relief:

    I.    Trial counsel provide[d] ineffective assistance by failing to request appropriate jury instructions on self-defense.

(Pet., ECF No. 1-1, PageID.7.) Respondent asserts that Petitioner's ground for relief is meritless. (ECF No. 6.) The Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I. Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

> [Petitioner] and Robert Barroso were best friends for most of their lives, but their relationship became strained in April 2015 when Barroso had an affair with [Petitioner's] then-fiancée. [Petitioner] and Barroso engaged in a physical altercation after [Petitioner] discovered the affair, and the two men had other disagreements thereafter. The arguments between [Petitioner] and Barroso culminated in an agreement to meet at a remote area to fight on December 27, 2016. [Petitioner] testified at trial that he shot Barroso with a .17 caliber rifle and stabbed Barroso with a knife, but that he shot Barroso after Barroso pulled out a knife and stabbed Barroso with that knife while in an adrenaline-fueled state of panic and anger.
>
> At trial, the prosecution introduced evidence that Barroso and [Petitioner] exchanged online instant messages on December 27 in which they agreed to fight and agreed on a location. [Petitioner] testified that he considered the matter for 20 minutes before deciding to meet and fight Barroso. [Petitioner] then drove to the residence that Barroso and his mother shared. Barroso's mother testified that [Petitioner] accelerated his car from a parked location nearby and almost hit Barroso as he was entering his car. She also testified that [Petitioner] threatened to kill Barroso. [Petitioner] denied threatening to kill Barroso and testified that he only said that he would follow Barroso to the agreed-upon location to fight him.
>
> [Petitioner] testified that he brought a pocket knife, a .17 caliber semiautomatic rifle, and bullets for the rifle with him to the fight location, although he testified that the rifle was in his car for unrelated reasons. [Petitioner] further testified that, at the agreed location, he and Barroso exited their cars. After an exchange of words, Barroso started walking toward him. [Petitioner] testified that he obtained and loaded his rifle, set it on top of his car door and fired four warning shots.[1] He testified that Barroso did not stop advancing and produced a knife, and that he subsequently shot Barroso five times. [Petitioner] stated that he approached Barroso as he lay on the ground, took Barroso's knife, and stabbed him once. However, Barroso's autopsy revealed that he was shot five times in the back and arms and was stabbed five times in the head and neck. A forensic pathologist testified that the gunshots would have rendered Barroso unable to use his arms and

2

legs and that the five stab wounds to Barroso's head and neck were fatal injuries. [Petitioner] admitted at trial that he hid Barroso's body, car, and car keys following his death. [Petitioner] also admitted that he cleaned the location where Barroso died and made false statements to police officers about the incident and Barroso's whereabouts.

[Petitioner's] theory of the case was that he killed Barroso either in a moment of anger or in self-defense. The trial court instructed the jury on the elements of the crimes of first-degree premeditated murder, second-degree murder, voluntary manslaughter, and self-defense. The jury convicted [Petitioner] as described.

_____

[1] On cross-examination, [Petitioner] testified that he loaded the rifle's magazine while driving to the agreed-upon fight location.

*People v. Getter*, No. 340820, 2019 WL 845772, at *1–2 & n.1 (Mich. Ct. App. Feb. 21, 2019).

Jury selection for Petitioner's trial began on August 8, 2017. (Trial Tr. I, ECF No. 7-3.) Over the course of three days, the jury heard testimony from numerous witnesses, including Barroso's mother, Petitioner's ex-fiancée, law enforcement officers, Petitioner's brother, a forensic pathologist, and Petitioner himself. (Trial Tr. I, II, & III, ECF Nos. 7-3, 7-4, 7-5.) On August 11, 2017, the jury reached a guilty verdict. (Trial Tr. IV, ECF No. 7-6, PageID.610.) Petitioner appeared before the trial court for sentencing on October 2, 2017. (ECF No. 7-7.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals, challenging only the sufficiency of the evidence to support a finding of premeditation. *See Getter*, 2019 WL 845772, at *2. The court of appeals affirmed Petitioner's convictions and sentences on February 21, 2019. *Id.* at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on September 10, 2019. *See People v. Getter*, 932 N.W.2d 621 (Mich. 2019).

On December 7, 2020, Petitioner, with the assistance of the same attorney who is representing him for this federal habeas proceeding, filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500, raising the same claim that Petitioner now raises as his

sole ground for federal habeas relief. (ECF No. 7-8.) The trial court held a hearing on Petitioner's motion on April 12, 2021. (ECF No. 7-11.) At the conclusion of the hearing, the trial judge orally stated that he was denying Petitioner's Rule 6.500 motion. (*Id.*, PageID.682.) The trial court memorialized that decision in a written order entered on April 21, 2021. (ECF No. 7-12.) The court of appeals and the supreme court denied Petitioner's applications for leave to appeal on June 16, 2021, and January 4, 2022, respectively. (ECF No. 7-14, PageID.770; ECF No. 7-16, PageID.1455.) This § 2254 petition followed.

## II. AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not

4

consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is

5

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "[I]f a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits." *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

### III. Discussion

Petitioner's sole ground for relief is that "[t]rial counsel provide[d] ineffective assistance by failing to request appropriate jury instructions on self-defense." (Pet., ECF No. 1-1, PageID.7.) In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective

assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential," per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And then scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d), analysis of counsel's performance. In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied

*Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . ." (citing *Harrington*, 562 U.S. at 102)).

During oral argument regarding Petitioner's Rule 6.500 motion, the parties recognized that Petitioner's claim for relief was governed by the standard set forth in *Strickland*. (ECF No. 7-11, PageID.680.) The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

8

*Id.* at 406. Therefore, Petitioner can only overcome the deference afforded state court decisions if the state court's determination was based on an unreasonable application of *Strickland* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

Petitioner contends that trial counsel rendered ineffective assistance by not requesting proper self-defense jury instructions. As noted above, the trial court did instruct the jury regarding self-defense. Specifically, it gave the following instruction:

> The defendant claims that he acted in lawful self-defense. A person has the right to use force, even take a life to defend himself under certain circumstances. If a person acts in the lawful—in lawful self-defense that person's actions are justified and he is not guilty of homicide.
>
> You should consider all the evidence and use—and use the following rules to decide whether the defendant acted in lawful self-defense.
>
> Remember to judge the defendant's conduct according to how the circumstances appeared to him at the time he acted. First that the time he acted the defendant must have honestly and reasonably believed that he was in danger of being killed or seriously injured. If the defendant—if the defendant's beliefs were honest and reasonable he could act immediately to defend himself even if it turned out later that he was wrong about how much danger he was in. In deciding if the defendant's beliefs were honest and reasonable you should consider all the circumstances as they appear to the defendant at the time. Second, a person may not kill or seriously injure another person just to protect themself against what seems like a threat of only minor injury. The defendant must have been afraid of death or serious physical injury. When you decide if the defendant was afraid of one or more of these you should consider all the circumstances. The conditions of the people involved including their relative strength, whether the other person was armed with a dangerous weapon or had some means of injuring the defendant. The nature of the other person's attack or threat, whether the defendant knew about any previous violent acts or threats made by the other person. Third, at the time he acted the defendant must have honestly and reasonabl[y] believed that what he did was immediately necessary. Under the law a person may use as much force as he thinks is necessary at the time to protect himself. When you decide whether the amount of force used seemed to be necessary you may consider whether the defendant knew about any other ways of protecting themselves. Sorry about that. I'll read that one more time. Third, at the time he acted—at the time he acted the defendant must have honestly and reasonably believed that he—that what he did was immediately necessary. Under the law a person may only use as much force as he thinks is necessary at the time to protect himself. When you decide whether the amount of

9

> force used seemed to be necessary you may consider whether the defendant knew about other ways of protecting himself. But you may also consider how the excitement of the moment affected the choice the defendant made.
>
> A person can use deadly force in self-defense only where it is necessary to do so. If a defendant could have safely retreated but did not do so you may consider that fact in deciding whether the defendant honestly and reasonably believed he need[ed] to use force, deadly force in self-defense.

(Trial Tr. III, ECF No. 7-5, PageID.598–600.) Petitioner asserts that because there is no duty to retreat under Michigan law, the trial court's provision of a duty-to-retreat instruction, "thwarted [Petitioner's] self-defense claim." (Pet., ECF No. 1-1, PageID.8.) Petitioner argues that "[t]rial counsel rendered deficient performance by allowing the instructions as given to stand." (*Id.*, PageID.25.)

At the conclusion of the April 12, 2021, motion hearing, the trial court rejected Petitioner's claim and Rule 6.500 motion, stating:

> Well I've had the opportunity to review the briefs as well as hear the brief argument here today. I was the judge who sat on that trial back when it was heard by the jury and took the verdict from the jury. Mr. Hultink was before the Court during the course of that trial and performed very well. I think more than sufficiently in fact probably well above that standard. In his defense he's a good lawyer and has been for a number of years and I think given the facts and circumstances he had did an excellent job representing [Petitioner] in this case. I know people may disagree based upon the verdict that was reached but he did very well with the facts he was given.
>
> The facts as I saw them pretty clearly this as indicated the facts do not speak to self-defense. I understand the defense disagrees with that too. And it was clearly I think there is an argument for a tactical decision although I understand the argument from Mr. Doman that this isn't tactical. It should have been given to the jury and I understand that the defense argues that. But I think the argument clearly was for a lesser conviction as opposed to a first degree conviction which the [Petitioner] was ultimately found guilty of. That somehow this was done in some type of emotional situation given the love triangle that was present. To me the injuries that were inflicted and the nature and position of those clearly were not supportive of a self-defense claim in this particular matter. I understand that again the defense differs in their opinion of what the facts are and the fact that the victim called and arranged this meeting somehow indicates that there is a self-defense claim and the instruction should have been given. Also if the conviction's been held up on appeal the appellate attorney as well as Mr. Hultink chose not to argue this particular issue. I

10

>don't think it's been preserved appropriately. Also I would indicate that and again I think the defense attorney acted well. He's not negligent or insufficient in any way in his representation of [Petitioner] given the facts and circumstances and evidence that he had to present.

(ECF No. 7-11, PageID.681–682.)

The State of Michigan has always recognized the common law affirmative defense of self-defense as a justification for the commission of certain criminal acts, including murder. On October 1, 2006, however, the State of Michigan gave effect to the self-defense act (SDA), Mich. Comp. Laws §§ 780.971–780.974, which modified the common law defense in the following provisions:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
>> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
>>
>> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.
>
> (2) An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual.

Mich. Comp. Laws § 780.972. But the SDA's modification of the common law defense goes no further than the words quoted above. *See* Mich. Comp. Laws § 780.973 ("Except as provided in [§ 780.972], this act does not modify the common law of this state in existence on October 1, 2006 regarding the duty to retreat before using deadly force or force other than deadly force."); Mich. Comp. Laws § 780.974 ("This act does not diminish an individual's right to use deadly force or

11

force other than deadly force in self-defense or defense of another individual as provided by the common law of this state in existence on October 1, 2006.") Thus, some understanding of the common law defense and the "duty to retreat" is necessary to understand the scope and limits of the defense.

In *People v. Riddle*, 649 N.W.2d 30 (Mich. 2002), the Michigan Supreme Court summarized key concepts underlying the defense of self-defense and the limits of the "duty to retreat:"

> As a general rule, the killing of another person in self-defense by one who is free from fault is justifiable homicide if, under all the circumstances, he honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force. The necessity element of self-defense normally requires that the actor try to avoid the use of deadly force if he can safely and reasonably do so, for example by applying nondeadly force or by utilizing an obvious and safe avenue of retreat.
>
> There are, however, three intertwined concepts that provide further guidance in applying this general rule in certain fact-specific situations. First, a person is never required to retreat from a sudden, fierce, and violent attack; nor is he required to retreat from an attacker who he reasonably believes is about to use a deadly weapon. In these circumstances, as long as he honestly and reasonably believes that it is necessary to exercise deadly force in self-defense, the actor's failure to retreat is never a consideration when determining if the necessity element of self-defense is satisfied; instead, he may stand his ground and meet force with force. That is, where it is uncontested that the defendant was the victim of a sudden and violent attack, the Court should not instruct the jury to consider whether retreat was safe, reasonable, or even possible, because, in such circumstances, the law does not require that the defendant engage in such considerations.
>
> Second, Michigan law imposes an affirmative obligation to retreat upon a nonaggressor only in one narrow set of circumstances: A participant in voluntary mutual combat will not be justified in taking the life of another until he is deemed to have retreated as far as safely possible. One who is involved in a physical altercation in which he is a willing participant–referred to at common law as a "sudden affray" or a "chance medley"–is required to take advantage of any reasonable and safe avenue of retreat before using deadly force against his adversary, should the altercation escalate into a deadly encounter.
>
> Third, regardless of the circumstances, one who is attacked in his dwelling is never required to retreat where it is otherwise necessary to exercise deadly force in self-defense. When a person is in his "castle," there is no safer place to retreat; the

> obligation to retreat that would otherwise exist in such circumstances is no longer present, and the homicide will be deemed justifiable. This is true even where one is a voluntary participant in mutual combat. Because there is no indication that this "castle doctrine" extended to outlying areas within the curtilage of the home at the time of the codification of our murder statute, however, we decline defendant's invitation to extend the doctrine in this manner; we hold instead that the doctrine is limited in application to the home and its attached appurtenances.

*Riddle*, 649 N.W.2d at 34–36 (footnotes and emphasis omitted).[1] A footnote in the *Riddle* opinion summed up the circumstances where "there is never a duty to retreat," *id*. at 46:

> There might be circumstances in which an instruction permitting the jury to consider a defendant's failure to retreat would be improper; for instance, if the defendant was inside his dwelling when he was attacked or if the undisputed evidence established that he was suddenly and violently attacked.

*Id*. at 46 n.30 (citation omitted). One standard instruction in use regarding retreat at the time the SDA went into effect read as follows:

> A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed [he / she] needed to use deadly force in self-defense.

*People v. Cox*, No. 242364, 2003 WL 23104243, at *2 (Mich. Ct. App. Dec. 30, 2023). That is the same language the judge used to instruct Petitioner's jury. Indeed, that language remains part of the Michigan Model Criminal Jury Instructions[2] today:

> M Crim JI 7.16 Conditions for Using Force or Deadly Force
>
> > [*Select from the following depending on the evidence and circumstances:*]
> >
> > (1) **A person can use [force / deadly force] in self-defense only where it is necessary to do so. If the defendant could have safely**

---

[1] The *Riddle* court went on to explain the general rule and the three "duty to retreat" concepts in greater detail later in the opinion. 649 N.W.2d at 38–45. For purposes of resolving Petitioner's challenge, the more concise statements will suffice.

[2] The Michigan Model Criminal Jury Instructions "must be given in each action in which jury instructions are given if (a) they are applicable, (b) they accurately state the applicable law, and (c) they are requested by a party." Mich. Ct. R. 2.512(D)(2); *see also People v. Lyles*, 905 N.W.2d 199, 204 n.8 (Mich. 2017) (quoting the rule).

13

       **retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed [he / she] needed to use [force / deadly force] in self-defense.**[1]

[*or*]

(1)   A defendant who [assaults someone else with fists or a weapon that is not deadly / insults someone with words / trespasses on someone else's property / tries to take someone else's property in a nonviolent way] does not lose all right to self-defense. If someone else assaults [him / her] with deadly force, the defendant may act in self-defense but only if [he / she] retreated where it would have been safe to do so.[1]

(2)   However,[1] a person is never required to retreat under some circumstances. [He / She] does not need to retreat if [attacked in (his / her) own home / (he / she) reasonably believes that an attacker is about to use a deadly weapon / (he / she) is subjected to a sudden, fierce, and violent attack].[2]

(3)   **Further, a person is not required to retreat if he or she**

    **(a)**   **has not or is not engaged in the commission of a crime at the time the [force / deadly force] is used,**

    **(b)**   **has a legal right to be where he or she is at that time, and**

[*Select from the following according to whether the defendant used deadly force or nondeadly force:*]

    **(c)**   **has an honest and reasonable belief that the use of deadly force is necessary to prevent imminent [death / great bodily harm / sexual assault] of [himself / herself] or another person.**

[or]

    (c )has an honest and reasonable belief that the use of force is necessary to prevent the imminent unlawful use of force of against [himself / herself] or another person.

*Use Note*

Use this instruction when requested where some evidence of self-defense has been introduced or elicited. Where there is evidence that, at the time that the defendant used force or deadly force, he or she was engaged in the commission of some other crime, the Committee on Model Criminal Jury Instructions believes that

14

> circumstances of the case may provide the court with a basis to instruct the jury that the defendant does not lose the right to self-defense if the commission of that other offense was not likely to lead to the other person's assaultive behavior. See People v Townes, 391 Mich 578, 593; 218 NW2d 136 (1974). The committee expresses no opinion regarding the availability of self-defense where the other offense may lead to assaultive behavior by another.
>
> 1.   Paragraph (1) and "However" should be given only if there is a dispute whether the defendant had a duty to retreat. *See People v Richardson*, 490 Mich 115; 803 NW2d 302 (2011).
>
> 2.   The court may read whatever alternatives may apply or adapt them to other circumstances according to the evidence presented at trial.

Mich. Model Crim. Jury Instructions 7.16 (bold-type emphasis added).

If the pieces of the self-defense puzzle are, on the one hand, the common law defense that includes some duty to retreat, and on the other hand, the modifying language of Mich. Comp. Laws § 780.972, which purports to change the common law defense only by shifting the "duty to retreat" boundaries, one would think that it would be a simple matter to join those two pieces together seamlessly, i.e., to whatever extent the SDA has reduced the duty to retreat, it expanded the defense.

But words are not always such precise tools. Before the SDA, there were circumstances where you did not have a duty to retreat: in your dwelling, when you were subject to a sudden violent attack, and where you reasonably believed your attacker was about to use a deadly weapon. Then there was a circumstance where you had an affirmative duty to retreat: when you were engaged in voluntary mutual combat. In between those two extremes, however, is where most self-defense claims fall. In that middle ground, the law did not actually require a retreat, nor did it absolutely forgive a failure to retreat. Instead, the common law simply considered the availability of a safe retreat in deciding whether the belief that deadly force was necessary was both honest

15

and reasonable. Does permitting such consideration constitute the imposition of a "duty to retreat"?[3]

Logic suggests that it was precisely that middle ground—the permissible consideration of the availability of retreat—that the SDA meant to restrict. But if that was the intention, the legislators did not choose their words very well. The words of § 780.972 appear to leave intact the "duty to retreat" in two circumstances, when the user of deadly force does not have a legal right to be there and when the user of deadly force is committing a crime. But then the statute also adds that the user of deadly force must "honestly and reasonably believe[] that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual." Mich. Comp. Laws § 780.972. That requirement, however, simply restates the foundational requirement of the common law defense, a defense that has invited consideration of the availability of a safe retreat. If the "duty to retreat" and the "consideration of the availability of a safe retreat" are the same thing, the legislature could have been much more clear by stating that finders of fact may not consider the availability of a safe retreat when deciding whether users of deadly force honestly and reasonably believe deadly force is necessary so long as the user is not committing a crime and has a legal right to be where the use of deadly force occurs.

Absent that clarity there is an irreconcilable tension between the goals of preserving the common law defense and changing only the "duty to retreat." That tension plays out in the model instruction. Jurors are invited to consider whether the user of force could have safely retreated

---

[3] That is Petitioner's argument. Petitioner asserts that there is no duty to retreat under Michigan law and the trial court provided a duty-to-retreat instruction, which thereby "thwarted [Petitioner's] self-defense claim." (Pet., ECF No. 1-1, PageID.8.) But the trial court never informed the jury that Petitioner had a duty to retreat; it simply told them that they could consider the availability of a safe retreat in deciding the reasonableness of Petitioner's decision to use deadly force.

16

when assessing the honesty and reasonableness of the user's belief that force was necessary and also advised that retreat is not required where two conditions are met and the user of force honestly and reasonably believes the use of force was necessary. That could leave a jury spinning in circles.

The tension in the instructions is not the focus of Petitioner's complaint. Rather, Petitioner contends that his trial was rendered unfair because the trial judge did not read the second part of the instruction—the part that informs the jury that retreat is not required under the statutory circumstances—and counsel did not object. The failure to read that part of the instruction eliminates the tension, but it eliminates the tension in favor of always considering whether or not a safe retreat is available. Petitioner contends that counsel's failure to object is inexplicable, professionally unreasonable, and highly prejudicial.

The trial court's resolution of Petitioner's motion for relief from judgment,[4] does not squarely address the explanation for counsel's failure to object or the reasonableness of that decision; but the trial court did make clear that the failure to object was not prejudicial. The trial judge focused on the fact that the self-defense claim was plainly meritless—the facts simply did not support it. (ECF No. 7-11, PageID.681–682.)

---

[4] It is the trial court's resolution of this claim that this Court must evaluate for consistency with clearly established federal law. The trial court resolved this ineffective assistance claim on the merits and the appellate courts denied leave to appeal in form orders. Such form orders are presumed to uphold or reject the last reasoned decision below. *Guilmette v. Howes*, 624 F.3d 286, 291–92 (6th Cir. 2010) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). When a Michigan appellate court denies review of a claim using a summary order citing Mich. Ct. Rule 6.508(D), a federal court conducting habeas review must "look to the last reasoned state court opinion to determine the basis for the state court's rejection of [the] claim." *Id.* at 291. Under *Guilmette*, the Court looks through the decisions of the Michigan Supreme Court and Michigan Court of Appeals to the decision of the state trial court.

Petitioner's testimony includes the beginning of a colorable self-defense claim. The victim approached Petitioner with a knife and Petitioner shot him—five times.[5] The shots dropped the victim to the ground, but did not kill him. At that point, Petitioner apparently realized that the victim was no longer a threat. He put the rifle in the car and advanced to the victim. Petitioner picked the knife up off the ground, exchanged words with the victim, and then "snapped." He stabbed the victim multiple times in the head and neck, killing him. Petitioner only recalled stabbing once, but he believed that strike was the one that the pathologist described as the fatal blow.[6] Even if Petitioner was justified in his initial use of deadly force when he fired the rifle, he could have no honest and reasonable belief that the use of deadly force with the knife was necessary after he stowed his weapon, advanced to the prostrate victim, took his knife, and stabbed the victim multiple times causing the victim's death.

It is important to keep in mind that defense counsel did not simply fail to object to the purportedly faulty self-defense instruction; counsel entirely abandoned the self-defense claim. He

---

[5] Petitioner's testimony regarding the "fight" appears in the record at (Trial Tr. III, ECF No. 7-5, PageID.527–539, 541–544, 551–554, 562.)

[6] Forensic pathologist Joseph Prahlow testified at trial. Dr. Prahlow testified that he was the one who performed the autopsy on Barosso's body. (Trial Tr. III, ECF No. 7-5, PageID.457.) Dr. Prahlow testified that there were five entrance wounds on Barosso's body from gunshots, and that there were "some partial exit wounds." (*Id.*, PageID.465.) One of the gunshot entrance wounds was on "the lower right back area." (*Id.*) All gunshot injuries, with the exception of one, were "back to front," suggesting that at least four of the shots were made when Barosso was facing away from Petitioner. (*Id.*, PageID.473.)

Dr. Prahlow testified that there were also "at least five . . . sharp force injury complexes" on Barosso's body. (*Id.*, PageID.476.) He testified that the stab wound to Barosso's temporal parietal scalp was the fatal wound because it went through the skin and skull all the way into the brain. (*Id.*, PageID.477–478.) When asked if Barosso would have been able to defend himself while lying on the ground if the gunshot wounds preceded the stab wounds, Dr. Prahlow testified that he would not have "significantly" been able to because "of the essentially lack of use [of] the arms from the broken bone and likely not the legs because of the injuries of the nerves coming off the spinal cord." (*Id.*, PageID.488.)

did not even mention it in closing. That claim was obliterated by Petitioner's testimony. As the trial judge noted, the facts simply did not support self-defense.

Petitioner cannot establish an ineffective assistance of counsel claim under *Strickland* if counsel's error had no effect on the judgment. For Petitioner to suggest that it was the jury's potentially improper consideration of his failure to retreat that cost him his self-defense claim is patently absurd. On the record before this Court, the trial judge's conclusion that the facts elicited at trial simply did not support a self-defense claim is eminently reasonable. Where Petitioner's own testimony never supported the self-defense claim, he has not shown and cannot show that the result at trial would have been any different if counsel had objected to the instruction regarding the SDA. Thus, Petitioner has also failed to show that the trial court's rejection of his ineffective assistance claim is an unreasonable application of *Strickland*, the clearly established federal law regarding ineffective assistance of counsel. Petitioner is, therefore, not entitled to habeas relief.

### IV. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable

19

or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claim was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated: September 29, 2023         /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  CHIEF UNITED STATES DISTRICT JUDGE